## FLANIGAN v. METROPOLITAN LIFE INS. CO.

### No. 4318.

Court of Appeal of Louisiana. Second Circuit, Second Division.

June 11, 1932.

Jackson & Smith, of Shreveport, for appellant.

Stephens & Gahagan, of Natchitoches, for appellee.

CULPEPPER, J.

This is a suit by an employee to recover for the alleged accidental loss of one eye under a group accidental death and dismemberment policy issued by the defendant, Metropolitan Life Insurance Company, to the Texas & Pacific Railway Company upon its employees. Under the certificate which was delivered to plaintiff, one of the railway company's employees, under the terms of the policy, it is stipulated that for the loss of an eye caused directly and independently of all other causes by violent and accidental means, the insurance company shall pay the sum of $500.

Plaintiff alleges that on the 11th day of August, 1931, while at work for the railway company as a member of its section crew on

the company's railroad track between Victoria and Robeline in Natchitoches parish, a passenger train of the railway company passed and "either knocked, or threw or blew something into his eye which caused him to lose all sense of sight in said eye." He alleges that said loss of his eye was caused directly and solely by the accidental injury thus received. It is alleged that in September following, notice and due proof of the accident and injury was furnished to defendant; that defendant refused and still refuses to make settlement; that more than thirty days have elapsed, and therefore defendant is liable for double the amount due under the terms of the policy, or the sum of $1,000, as penalty, together with a reasonable attorney's fee, which plaintiff places at $200. He prays for judgment for $1,000 plus attorneys' fee of $200, with legal interest from judicial demand. The defense as set up in the answer was a general denial. There was judgment for plaintiff in the full amount sued for, and defendant appealed.

The defense in the trial of the case was that plaintiff, at the time he claims to have been injured, and for an indefinite time previous, was blind in the eye (the left eye) which he now claims was struck and injured, and was not aware of the blindness until sand or some small object got in the eye causing slight irritation sufficient to cause him to go to a doctor, who upon an examination discovered the blindness. Plaintiff, on the other hand, claimed and testified that he could always see out of the eye; that nothing had ever been wrong with his vision; and that the loss of vision was caused solely by the injury received on that occasion.

A number of witnesses who had known plaintiff for some time, including his wife, testified that they had never noticed or known that plaintiff could not see out of the eye and had never heard him complain about not being able to see with it.

At the time the train passed, which was about 9 o'clock in the morning, plaintiff was standing within a few feet of the tracks. Immediately after the train passed plaintiff called to Henry Harris, another workman near him, and asked Harris to get some trash out of his eye. Harris testifies that he found a grain of sand down between the eye and the eyelid and poured some water in the eye and washed it out. He said that he saw plaintiff rubbing his eye just before the water was poured in it. Lee Smith, another workman near by, testified he saw Harris and plaintiff go to the water keg and saw them standing there, but did not notice Harris pour any water in plaintiff's eye, but that he did hear him complaining of his eye hurting him after the train passed.

R. W. Haynes, the section foreman, testified that he was within thirty feet of plaintiff at the time, saw Harris doing something

to plaintiff's eye, and went himself and looked in his eye, but could find nothing in it nor anything the matter with it. He says plaintiff went back to work but later complained that his eye was hurting him, said he could not work, and went home. When he got home, so his wife testifies, she saw something like a pine straw in his eye and poured milk in it to wash it out. Soon after that the railway company's claim agent and roadmaster came and took plaintiff to Dr. Glass, the company's doctor at Robeline. Dr. Glass testifies that he found nothing wrong with the eye except that it set out. He states that there was no inflammation and no redness nor any foreign body in the eye, and that there was no evidence that there had been anything in it, or that plaintiff had been rubbing his eye. The doctor did not discover that plaintiff could not see out of the eye, but says he was not an eye specialist.

Plaintiff was given an eye wash medicine, left, and returned the next day for further treatment, and Dr. Glass sent him to an eye specialist in the Texas & Pacific hospital at Marshall, Tex. Plaintiff testifies that when he at first reached the hospital, a certain doctor, whose name he does not know, put some kind of hot medicine in his eye and washed out the eye. Asked:

"Q. What happened to your eye? A. Well I lost sight of my eye after he washed it out.

"Q. Could you see anything then? A. Yes sir, but what I could see was red.

"Q. After you got back home could you see anything out of your eye? A. No sir."

It seems that this doctor, whoever he was, who put the medicine in plaintiff's eye the first day he arrived at the hospital (which was on the night of the 13th of August), was not the eye specialist. The next day Dr. Hartt, the eye specialist, examined the eye and found that it was out. Dr. Hartt testifies that he found no inflammation in the eye, no infection, no redness, and no indication of any foreign body having been in it, and declares that the eye had not been injured. He did find, however, that the eye was "turned out about thirty degrees" angle, and attributes the blindness in that eye solely as a result of its nonuse by reason of its being thus turned out. He says blindness always follows such a condition when it is confined to just one of the eyes; that the blindness comes on gradually, reaching total blindness often unaware to the person, at about the age of twenty. Plaintiff is about thirty-five years of age now. Notwithstanding this, Dr. Hartt says he put some boric acid in the eye, also that plaintiff appeared to be very much disturbed about its condition.

Yet Dr. Hartt says it would have been utterly impossible for the blindness to have been caused by anything being knocked or thrown in the eye without its having shown

evidence of an abrasion three days after it had happened; that there would have been some inflammation; that an eye is sometimes easy to be knocked out, but it has to be hurt with a blow to do so. He says plaintiff had no cataract on the eye at the time; that if the blindness had been caused by a cataract produced by trauma, there would have been some showing of the trauma at the time he saw plaintiff. He states, however, that a traumatic cataract can form without a perforation; that they appear as a rule within two or three weeks after the trauma, but admits there are exceptions to the rule. Asked why he put the boric acid in the eye if he found no inflammation, the doctor said he did it to "ease his mind."

In the early part of November following, plaintiff went to Dr. Webb in Natchitoches. Dr. Webb graduated in medicine in June, 1930, spent four months immediately thereafter in the Charity Hospital in New Orleans, and during two months of that time made a special study of diseases of the eye and removed several cataracts. He gives it as his opinion that plaintiff's blindness was due to traumatic cataract "for the simple reason," he states, "that there is no inflammation, but there was some inflammation of the iris and the muscles to which it was attached." He says there is no definite time for a traumatic cataract to form and that it is not necessary for the eye to have a perforation. He says that a concussion or electrical shock might cause a cataract.

"Q. Suppose there was no electrical shock or no concussion, would it be necessary for the eye itself to be struck? A. Not necessarily, but there would be some injury done.

"Q. What I want to know is whether or not a person can sustain a traumatic cataract without the eye showing some evidence of it besides the cataract itself? A. There is bound to be some type of inflammation or some pain."

Asked, would a cataract caused by trauma leave evidence in the eye, the doctor answered, "Yes, there was at the time I examined the eye."

"Q. The evidence you found was the cataract? A. No, sir, the cataract and the inflammation.

"Q. You found that? A. I did."

Dr. Webb states that blindness is never caused in an eye by its being turned outward like this one, as testified to by Dr. Hartt; that he has never heard of one doing so; and that he has never been taught it.

■ While the testimony is conflicting as between that given by Dr. Webb and Dr. Hartt, Dr. Webb's testimony appears the more reasonable as a whole. We are unable to perceive how or why it was that Dr. Hartt, also Dr. Glass, was unable to discover any red-

ness, soreness, inflammation, or evidence of plaintiff's even having rubbed the eye, in face of the fact that plaintiff actually did have something to happen to his eye when the train passed him. Whatever it was, whether sand, straw, or pebble, or both sand and pebble, plaintiff immediately began rubbing it, had his fellow workman to pour water in it, had his wife wash it with milk, was carried by the claim agent and roadmaster to a doctor, the doctor gave him medicine and sent him on to the hospital, where he was given medicine by the eye specialist. And the first doctor at the hospital put some evidently very stringent medicine in it. In view of all this happening, it is very hard to believe, as defendant contends, that there was no sign left of any injury whatever. It seems the more reasonable to conclude that something rather serious happened to the eye, or all this treatment would not have been thought necessary. And Dr. Webb's testimony is positive that even when he examined plaintiff, some three months later, he found a cataract and still some inflammation. We think it is evident that a pebble, or some object large and heavy enough to cause a shock or concussion, struck the eye. Although it may not have hit directly in the eye and produced an abrasion, it was sufficient to and did produce blindness. It is not reasonable to account for the existence of the cataract and blindness upon any other theory, and such will be our findings.

■ Notwithstanding we have reached the conclusion that plaintiff's loss of vision was due to the accidental injury alleged upon, and that he is entitled to recover the amount called for in the policy, we do not think the circumstances as disclosed by the evidence warrant the imposition of the penalties assessed by the lower court. Act No. 310 of 1910, under which the penalties are claimed, provides: "That payment by such companies to the assured shall not be delayed for a longer period than thirty days from due notice and proof of disability, without just and reasonable grounds such as to put a reasonable and prudent business man on his guard." Section 2.

From the notice of proof, which is filed in evidence, it is shown that Dr. Glass certified of date November 11, 1931, that he treated plaintiff only once and gave as nature of injury "supposed trash in left eye." Plaintiff did not complete this report until November 12th, showing the eye was out and caused by accident while at work. This notice, or report, did not reach defendant's office in New York until November 13th, and the suit was filed December 7th, which was less than thirty days after receipt of notice. The notice itself is not filled out by the employer, and that part made by Dr. Glass was not as explicit by any means as it should have been. Besides, if Dr. Glass and Dr. Hartt expressed

to defendant the views as testified to by them before the court, and it is to be assumed they did, defendant no doubt felt that it was not liable. In view of these circumstances we think defendant should not be held to pay the penalties, and none will therefore be assessed.

The judgment therefore will be amended by reducing the amount awarded from $1,200 to $500 with legal interest from judicial demand, thus rejecting the demands for double the amount of the policy and attorney's fees. As thus amended the judgment is affirmed.